IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :    CRIMINAL ACTION
                            :    NO. 07-737-04
    v.                  :
                            :
DAANIYAL MUHAMMAD       :

FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDUARDO C. ROBRENO, J.                 JUNE 18, 2010

## I.   BACKGROUND

On November 5, 2008, Defendant Daaniyal Muhammad (a/k/a "Officer Lil", "Kalil"), an alleged member of the Smith Crack Cocaine Gang ("SCCG") was charged in the second superseding Indictment[1] with one count of conspiracy to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. §§ 846 and 841(a)(1)(A). See Second Superseding Indictment. The second superseding Indictment alleges that Defendant is responsible for distributing .3 grams of crack cocaine and possession with intent to distribute 3.6 grams of crack cocaine in Elkton, Maryland. See id. ¶ 5.

On December 18, 2008, the Court held a competency

---

[1]    On November 28, 2007, Defendant was first charged in a sealed Indictment and a bench warrant was issued for his arrest. See doc. nos. 1, 6. He has been in custody since March 5, 2008. See doc. no. 142.

hearing at which Defendant was found to be in need of further medical examination to determine whether he was competent to stand trial. See 18 U.S.C. § 4241(b).[2] Following the competency hearing, the Court determined that Defendant was suffering from a mental disease rendering him unable to assist in his defense, was not competent to stand trial, and ordered that he be committed to the custody of the Attorney General for treatment. See 18 U.S.C. § 4241(d)(1).[3]

On July 22, 2009, upon Defendant's continued refusal to take any medication or to agree to any treatment whatsoever and

---

[2]     Section 4241(b) permits the Court to order "that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court." 18 U.S.C. § 4241(b). Sections 4247(b) and (c) govern the specifics of the psychiatric or psychological examination and the report to the Court. 18 U.S.C. §§ 4247(b), (c).

[3]     Section 4241(d)(1) provides:

If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.

18 U.S.C. § 4241(d)(1).

the medical evaluators' recommendations that Defendant be placed on antipsychotic drugs to restore him to competency to stand trial, the Government moved to involuntarily medicate Defendant.[4] On September 11, 2009, Defendant, by way of counsel, filed a reply in opposition to the motion.[5]

On November 5, 2009, the Court held an evidentiary <u>Sell</u> hearing to determine whether involuntary administration of medication to restore Defendant's competency to stand trial was appropriate.  This issue is presently before the Court.

After consideration of the testimony presented at the <u>Sell</u> hearing, the Government's proposed findings of facts (doc. no. 696 at 2-11), Defendant's proposed findings of facts (doc. no. 719 at 1-5) and arguments of counsel, below are facts the Court finds to be true.

## II.  FINDINGS OF FACT

1.    Defendant is a 29-year-old African American male from Philadelphia, Pennsylvania.  <u>See</u> Dr. Grant and Dr. Berger Rep. 1.

---

[4]    <u>See</u> <u>Sell v. United States</u>, 539 U.S. 166 (2003) (setting up procedure by which courts may hold a evidentiary hearing with expert testimony to determine the propriety of involuntary administration of medication to restore competency to stand trial).

[5]    Throughout these proceedings, Defendant has been represented by counsel.

2.    Defendant has a criminal history, beginning in 1996 at age 16, that includes charges of robbery, simple assault and theft.  Other charges, from 1998 through 2006, include theft by unlawful trafficking, receiving stolen property, criminal conspiracy, failure to appear, manufacturing and distribution of narcotics, possession with intent to distribute drugs, simple assault, terroristic threats, and disorderly conduct.  <u>See</u> Second Superseding Indictment.

3.    Defendant is one of eighteen defendants in this case, alleged to be part of the SCCG, a drug distribution conspiracy that lasted from November 2002 through September 2007.  To date, thirteen SCCG defendants have been sentenced and four were found guilty at trial and are awaiting sentencing.  Defendant is the only SCCG defendant whose charges remain unadjudicated.

4.    On August 22, 2008, Magistrate Judge Rice ordered Defendant to undergo a competency evaluation.  <u>See</u> doc. no. 277.

5.    On August 29, 2008, Dr. Pogos H. Voskanian filed a report detailing his competency evaluation of Defendant at the Federal Detention Center ("FDC"), Special Housing Unit.

6.    Dr. Voskanian noted that Defendant "displayed symptoms suggestive of thought disturbance and appeared to be hallucinating."  Dr. Voskanian concluded that "[g]iven [the

defendant's] presentation during the interview and lack of collateral information regarding his physical and mental health" the defendant "cannot be assessed as competent to stand trial." See Voskanian Rep. 2, 7.

7.    On September 16, 2008, the Court ordered that Defendant be committed to the custody of the Attorney General for psychiatric evaluation, pursuant to 18 U.S.C. §§ 4241(b) and 4247(b). See doc. no. 314. Defendant was transferred to the Metropolitan Correctional Center ("MCC") in Chicago, Illinois for further evaluation.

8.    On October 15, 2008, the Court received a letter from Dr. Ron Nieberding, Ph.D., a licensed clinical psychologist at the MCC, Chicago. Dr. Nieberding found that, upon commencing the evaluation, Defendant would only display a "menacing grin" and "demonstrated poor frustration tolerance and some degree of impulsivity." Defendant was also described as "overly paranoid, vague, grandiose, and preoccupied with religious themes." See Govt Sell Mem. ¶ 23. Further, Defendant allegedly instigated and participated in a fight prior to his arrival at MCC Chicago. See Def. Sell Mem. ¶ 15.

9.    While at MCC Chicago, Dr. Nieberding diagnosed Defendant with paranoid schizophrenia and a psychotic disorder not otherwise specified. Dr. Nieberding evaluated Defendant's mental status, noting that "Mr. Muhammad has exhibited behavior

(e.g. illogical and confused thinking, inappropriate affect, suspiciousness, and possibly visual hallucinations) that strongly suggest that he is experiencing significant symptoms of a psychotic disorder." See id. ¶ 14.

10. Dr. Nieberding also noted that Defendant refused medication and "is likely an appropriate candidate for hospitalization (competency restoration) under Title 18, United States Code, Section 4241(d)[,]" who could also benefit from intensive, in-patient therapy. Id.

11. On December 18, 2008, following the competency hearing, the Court determined that Defendant was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." See doc. no. 422. The Court ordered that Defendant be committed to the custody of the Attorney General for treatment, pursuant to 18 U.S.C. § 4241(d)(1). (Id.) Defendant was transferred to the Federal Medical Center ("FMC") Butner in North Carolina for evaluation.[6]

12. On February 2, 2009, pursuant to a Court Order, Defendant was admitted to FMC Butner to undergo a psychiatric

---

[6] On February 19, 2009, the Court ordered an extension for the evaluation period for Defendant to June 1, 2009, to account for delays in transporting Defendant to FMC Butner (doc. no. 504.)

evaluation, pursuant to 18 U.S.C. § 4241(d).

13.  On June 16, 2009, Ms. Sara M. Revell, Complex Warden at FMC Butner, wrote to the Court regarding Defendant's condition and enclosed the competency restoration study performed by her staff: Dr. Jill R. Grant, staff psychologist and Dr. Bruce R. Berger, staff psychiatrist.  <u>See</u> Grant and Berger Resumes.[7]

14.  While at FMC Butner, the following procedures were administered to Defendant during his evaluation: (1) clinical interviews; (2) behavioral observation; and (3) physical examination.  <u>See</u> Govt Sell Mem. 4.

15.  At Defendant's initial screening at FMC Butner, he presented as hostile with a wide-eyed stare and nonsensical speech.  Due to Defendant's hostility and unpredictability, the interview was terminated.  Defendant was then admitted to the secure housing unit, where he remained for the duration of his evaluation period.  <u>See</u> Def. Sell Mem. ¶ 7.

16.  Dr. Grant conducted an individual interview with Defendant and Dr. Berger provided psychiatric consultation.  <u>Id.</u>

17.  Defendant refused all medication throughout the evaluation period.  Doctors at FMC Butner were also unable to perform brain imaging on Defendant.  <u>See</u> Hr'g Tr. 47.

---

[7]     Dr. Grant is an expert in the area of clinical and forensic psychology and Dr. Berger is an expert in the area of general and forensic psychology.  <u>See</u> Govt Sell Mem. 4 n.1-2. Both were found by the Court qualified to testify by way of opinion.  <u>See</u> Fed. R. Evid. 702.

18.   Medical, correctional, and other mental health staff had an opportunity to observe Defendant's behavior during his stay at FMC Butner.  An initial nursing note indicated that Defendant's speech was tangential and difficult to follow, he appeared suspicious and guarded, questions had to be repeated multiple times to garner a response, and his answers were difficult to decipher.  See Def. Sell Mem.

19.   Further, during hospital rounds, Defendant was hostile with staff.  At other times, he was calm but spoke in a disorganized manner and smiled inappropriately.  Defendant was often observed lying on a mattress on the floor.  His room sanitation and nutritional intake were appropriate.  See id.

20.   Defendant underwent a routine physical examination and laboratory studies indicating the following: no acute physical abnormalities, negative screening for HIV and syphilis, blood indices and chemistries within normal limits.  Thus, Defendant was not placed on medications and he refused any medicines for mental health purposes.  Id.

21.   Based on the limited information he provided, evaluators learned that Defendant has many siblings, a possible history of emotional and physical abuse, does not have a high school education and did not earn a GED.  See Second Superseding Indictment.

22.   During the evaluation period at FMC Butner,

Defendant was informed that any information and results obtained would be shared with the Court and the attorneys involved in this case. Evaluators were unable to assess his understanding due to his impaired mental status. <u>See</u> Def. Sell Mem.

23. Defendant's mental history is largely unknown to the evaluators. He reported being hospitalized once and receiving outpatient mental health treatment, but specifics of the treatment are unknown. <u>Id.</u>

24. Drs. Grant and Berger considered other staff observations, along with their own, and diagnosed Defendant with Schizophrenia, Disorganized Type. Drs. Grant and Berger also noted a "rule-out diagnosis of antisocial personality traits given his lengthy criminal and substance abuse history."[8] Their report states that Defendant "remains not competent to proceed to trial" due in part to his "inability to communicate rationally." <u>See</u> Revell Eval. 6.

25. Defendant's diagnosed psychotic disorder (Schizophrenia, Disorganized Type) produces psychotic symptoms which render him incompetnet to stand trial. <u>See</u> Revell Eval.

26. Additionally, Dr. Grant stated that Defendant is a candidate for treatment with psychotropic medications. However,

---

[8] "A 'rule-out' diagnosis . . . is defined as 'evidence that [the patient] may meet the criteria for a diagnosis but [the doctors] need more information to rule it out." <u>United States v. Grape</u>, 549 F.3d 591, 598-99 (3d Cir. 2008).

since Defendant refused medication while at FMC Butner, Warden Revell requested "judicial oversight" to involuntarily treat Defendant pursuant to Sell.  See id.

27.  On November 5, 2009, this Court held a Sell hearing to determine whether to involuntarily medicate Defendant, at which Dr. Berger and Dr. Grant testified.

28.  At that hearing, Dr. Berger testified that, due to Defendant's impaired mental state, he would likely receive relief after taking psychotropic medication.  Further, both Drs. Grant and Berger agree that there is a substantial probability that Defendant can be restored to competency by receiving treatment with antipsychotic medication and that available alternative, less-intrusive treatments are unlikely to be effective in achieving the same results.  See Def. Sell Mem.

29.  Treatment with antipsychotic medication is an accepted and appropriate treatment for an individual diagnosed with schizophrenia.  Id.

30.  If forcible medication is ordered by the Court, maximal efforts will be made to gain cooperation of Defendant and he would initially be given a choice of oral or injectable administration.  Further, a copy of the Court Order would be read to Defendant.  See Hr'g Tr. 123-24.

31.  If the doctors do not gain Defendant's compliance, they will administer an injectable medication involuntarily.  To

do so, a team of trained professionals will enter Defendant's cell and restrain him.  The process will be repeated every 2 to 3 weeks, however it is unlikely that repetition will be necessary as Defendant is expected to respond favorably to the medication and will become more compliant.  <u>See</u> Govt Sell Mem. ¶ 31.

32.  Defendant would receive psychotherapy as an adjunctive treatment to the antipsychotic agents to improve factors such as insight, compliance or coping skills.  <u>See</u> <u>id.</u> ¶ 35.

33.  Haldol, Prolixin Decanoate, and Risperdal Consta are the three drugs most likely to be administered to Defendant. These drugs are commonly used in involuntary medication instances as they are long action and injectable.  <u>See</u> Sell Hr'g Tr. 90.

34.  Antipsychotic medication can produce beneficial clinical effects such as decreasing disorganized behavior and speech (both prominent here).  Further, it is likely that Defendant experiences delusional beliefs and symptoms of a perceptual disorder, such as auditory hallucinations.  However, Defendant refuses to answer questions about these symptoms.  When such symptoms are decreased with medication, they have less influence on an individual's decisions, judgments and perceptions.  Thus, individuals can interact more effectively with their attorneys in preparing their defense and maintain better control over their behavior in the courtroom.  The

treatment process allows the treated individual to make reasonable, rational, reality-based decisions regarding the processing of legal charges. <u>See</u> Govt Sell Mem.

35.   Side effects include akathisia (characterized by Parkinson-like symptoms), dyskinesia (similar symptoms), tardive dyskinesia (movement disorder affecting the upper/lower extremities, mouth or oral facial area or tongue), and neuroleptic malignant brain syndrome (causes muscular rigidity). <u>See</u> Sell Hr'g Tr. 106-07.[9]

36.   Drs. Grant and Berger opine that Defendant does not have insight or understanding that he has a mental illness. Therefore, Drs. Grant and Berger contend that Defendant does not believe he is in need of treatment of any type and is unlikely to engage in any form of psychotherapy (cognitive-behavioral, group, behavioral, interpersonal), as he has yet to participate in any form of therapy. <u>See</u> Revell Eval.

37.   Further, Drs. Grant and Berger believe that it is substantially unlikely that the proposed treatment would have serious side effects that would interfere with Defendant's ability to assist his attorney in preparing for trial and conducting his defense. <u>See</u> Govt Sell Mem.

38.   Though Dr. Berger was not aware of Defendant's

---

[9]   Dr. Berger has treated thousands of patients with psychotropic medications and, though side effects have occurred, none have been fatal. <u>See</u> <u>id.</u> 127.

background and thus could not include a complete history or drug use and prior treatment for mental illness, he is not concerned about administering psychotrophic medication, as he "believes that [they] have adequate information to proceed in a safe and responsible manner." <u>See</u> Hr'g Tr. 123:3-4.

39. Drs. Grant and Berger concluded that Defendant is not currently competent to stand trial and could not assess his factual knowledge about the legal system and his rational understanding of the charges against him due to his inability to communicate rationally. <u>See</u> Govt Sell Mem. ¶ 28.

After consideration of the Government's motion to involuntarily medicate Defendant to restore competency for trial, Defendant's opposition thereto, and expert testimony given at the <u>Sell</u> hearing, the issue is now ready for disposition.

## III. CONCLUSIONS OF LAW AND DISCUSSION

A. <u>Applicable Law</u>

1. <u>Competency</u>

To be considered competent, "[t]he defendant must have 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' and must possess 'a rational as well as factual understanding of the proceedings against him.'" <u>United States v. Jackson</u>, 342 F. Supp. 2d 343, 345 (E.D. Pa. 2004) (quoting <u>Jermyn v. Horn</u>, 266 F.3d 257, 283

-13-

(3d Cir. 2001)).  Factors relevant to this analysis may include "'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.'"  United States v. Jones, 336 F.3d 245, 256 (3d. Cir. 2003) (discussing factors relevant to district court's decision to hold a competency hearing) (quoting United States v. Leggett, 162 F.3d 237, 242 (3d Cir. 1998)).  An attorney's representation about his client's competency may also be considered.  Jones, 336 F.3d at 256.

        2.  Sell Hearing

     In Sell, the Supreme Court considered "whether the Constitution permits the Government to administer anti-psychotropic drugs involuntarily to a mentally ill criminal defendant in order to render that defendant competent to stand trial for serious, but nonviolent, crimes."  539 U.S. at 169. The Supreme Court held that a state's involuntary medication of a "prison inmate who has a serious mental illness with anti-psychotic drugs" is within the confines of due process, "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  Washington v. Harper, 494 U.S. 210, 227 (1990).

     The Sell Court found that the Government could involuntarily medicate a defendant but only "in limited circumstances, i.e., upon satisfaction of conditions that we

shall describe." 539 U.S. at 169. The four Sell factors that a court must consider when determining whether to involuntarily medicate a defendant are as follows:

> First, a court must find that important governmental interests are at stake . . . .
>
> Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair . . . .
>
> Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results . . . . And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods . . . .
>
> Fourth, as we have said, the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition.

539 U.S. at 180-81 (emphasis added). Recently, the Third Circuit clarified that while the first Sell factor is a legal question subject to de novo review, factors two through four are factual questions, which are subject to a review for clear error. Grape, 549 F.3d at 598-99. Further, during a Sell hearing, the Government "bears the burden of proof on factual questions by clear and convincing evidence." Id. at 598.

B.    <u>Application of the Sell Factors</u>

1.    <u>Important Governmental Interests</u>

Here, the Government argues that important governmental interests exist.  First, the Government points out that Defendant was part of an eighteen-defendant narcotics conspiracy, where the seriousness of the offense was great.  Thirteen of the SCCG defendants have already been sentenced and the remaining four are awaiting sentencing.  Thus, Defendant is the only defendant whose charges have not yet been adjudged.  Second, the Government argues that interests in a timely trial exist where witnesses have the freshest memories possible and evidence is best preserved.  Lastly, the Government contends that where Defendant potentially faces a long period of incarceration relating to the seriousness of the drug charges, administration of antipsychotic drugs will allow him to address the charges sanely in order to avoid commission of future crimes.

In response, Defendant, by way of counsel, opposes the forcible administration of medication and argues that special circumstances here militate against finding important governmental interests.  Defense counsel argues that though Defendant committed a serious crime, he would likely be civilly committed if he was not forcibly medicated and rendered competent to stand trial.  <u>See</u> 18 U.S.C § 4246(d) (holding that a criminal defendant will be civilly committed where he is "presently

suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another").

Further, defense counsel argues that Defendant's refusal to take antipsychotics would lead to a lengthy incarceration period, thus the Government's interest in Defendant's punishment for his crime and protecting the public is satisfied. See United States v. Moruzin, 583 F. Supp. 2d 535, 546 (D.N.J. 2008) ("Special circumstances may lessen the importance of [the Government's] interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill - and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime.") (citing Sell, 539 U.S. at 180).

The first Sell factor to be considered is the importance of the governmental interests at stake. See Sell, 539 U.S. at 180 (noting courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution").

Here, in considering the seriousness of the offense and case-specific considerations, the Court finds that important governmental interests exist. Defendant was part of a complex drug organization, the SCCG, that from November 2002 through

September 2007, bought, cooked and sold narcotics in the Philadelphia and Maryland.  See Second Superseding Indictment. Defendant is presently charged with conspiracy to distribute five kilograms of crack cocaine.  See id.  As such, the seriousness of the criminal activity of which Defendant took part is not disputed by the parties.  See Def. Sell Mem. 7 ("Admittedly, Mr. Muhammad has been charged with a serious offense.").

While there is merit to be given to the Government's interest in a timely trial, Defendant's interest in having a fair trial is also weighty.  While defense counsel argues that Defendant's placement in a secure housing unit does not pose a "substantial risk of bodily injury to another person or serious damage to property," Defendant has demonstrated, both in medical reports and before the Court, hostile, aggressive behavior. Defendant also incited a fight prior to being placed in a secure housing unit in MCC Chicago.  There is every indication that should Defendant be released from a secure housing unit, he would be a danger to others.  Further, Defendant's long history with the criminal justice system militates against prolonging adjudication of the pending charges so that Defendant may begin to serve his time and work towards rehabilitation.  See Hr'g Tr. 79:15-18 (noting Defendant has been involved with the legal system for fourteen (14) years, since the age of 16 and has a lengthy history of drug and alcohol abuse).

Additionally, without administration of antipsychotic drugs, Defendant is unlikely to be released from a secure housing unit, which keeps him isolated from other inmates. If the Court were to refuse forcible administration of medication, there is a likelihood (as has been the case since Defendant's admittance to MCC Chicago in September 2008) that Defendant could be isolated in perpetum. See Berger Test., Hr'g Tr. 83:22-23 ("He [Defendant] could have become chronically schizophrenic or chronically psychotic and maintain that for years.")

Finally, though the Court takes Defendant's special circumstances into consideration, Defendant not only refuses to take medication, but has refused to participate meaningfully in any type of medical interview or alternative treatment, such as psychotherapy. Where Defendant cannot rationally understand his charges or communicate his defense to his attorney, an offering of alternative, less intrusive treatments to forcible medication (such as psychotherapy) has become a Sisyphean task by which nothing has yet been accomplished or furthered. See Moruzin, 583 F. Supp. 2d at 546 ("We do not mean to suggest that civil commitment is a substitute for a criminal trial . . . . The potential for future confinement affects, but does not totally undermine the strength for the need for prosecution."). This standstill does not benefit the balance of justice to the public, and it is does not protect Defendant's interests in a timely and

fair adjudication of the charges against him.

As such, the Court finds that the Government has satisfied the first <u>Sell</u> factor by clear and convincing evidence and demonstrated that important governmental interests are at stake here.

### 2.    Furtherance of the Governmental Interests

The Government asserts that forced medication will "significantly further" the governmental interests at stake by rendering Defendant competent to stand trial.  The Government points out that there is a substantial probability that Defendant's mental acuity will result once antipsyhotic drugs are administered and that side effects of antipsychotics are substantially unlikely to interfere with Defendant's ability to assist his defense counsel in preparation of his defense or participate in the trial.

In turn, defense counsel argues that because Drs. Grant and Berger were unable to learn of Defendant's mental health history nor the length of time of his alleged schizophrenic episodes, forcible medication is not appropriate.  Defendant asserts that where Defendant's personal and psychological history prior to his current arrest in 2007 is largely unknown, his likelihood of a favorable response to antipsychotics is equally unknown.

The second <u>Sell</u> factor requires the Court to determine

whether the Government's interests will be significantly furthered by forcible administration of drugs. The Sell court instructed district courts to consider whether:

> administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

539 U.S. at 180.

As stated above, each doctor that has examined Defendant has found, in his or her medical opinion, that he is incompetent to stand trial as he suffers from mental health illnesses (diagnosed as Schizophrenia, Disorganized Type), disorganized thinking. As a result, Defendant has been unable to participate meaningfully in any court hearings to date due to his inability to communicate rational thoughts.

The medical evaluations that support competency restoration are as follows.[10] In August 2008, Defendant underwent a competency evaluation conducted by Dr. Pogos Voskanian, who stated that "it is my opinion with a reasonable degree of medical certainty, the defendant at the present time

---

[10] In terms of Defendant's diagnosis, though Dr. Berger was unable to obtain information from Defendant himself, Dr. Berger found that "in terms of his [Defendant's] presentation from a mental health perspective, it appeared that he did present with substantial and sustained symptoms that are consistent with the disorganized schizophrenia."

cannot be assessed as competent to stand trial." <u>See</u> Voskanian Rep. 7, dated 8/29/08. In September 2008, Defendant was examined and evaluated by Dr. Nieberding at MCC Chicago and found to be incompetent to stand trial. <u>See</u> Nieberding Eval. 1 ("Should these symptoms [illogical and confused thinking, inappropriate affect, suspiciousness, and possibly visual hallucinations] persist, and there is no indication they will not particularly considering he is refusing medication, Mr. Muhammad would likely be appropriate for hospitalization (competency restoration) under Title 18, United States Code, Section 4241(d)."). In June 2009, after observation and medical testing at FMC Butner, both Doctor Grant and Doctor Berger found that Defendant "remains not competent to proceed to trial" and that it is substantially likely that the antipsychotic drugs will restore Defendant's competency to stand trial. <u>See</u> Revel Rep. (recommending a full four-month period for restoration).

Dr. Berger is Defendant's current treating physician, and the physician who would prescribe and oversee the involuntary administration of antipsychotic medication. In his testimony before this Court during the <u>Sell</u> hearing, Dr. Berger testified that Defendant was likely suffering from Schizophrenia, Disorganized Type and that Defendant would greatly benefit, in both his thinking and quality of his life, by taking antipsychotics. <u>See</u> Dr. Grant Test., Hr'g Tr. 53 (testifying

that a 70-80% chance exists that Defendant's competency will be restored upon involuntary medication).  Dr. Berger also testified that medical examinations of Defendant were difficult as he refused to coherently answer questions or participate in any type of alternative treatment to medication, such as psychotherapy. See Berger Test., Hr'g Tr. 85:3-6 ("On a daily basis the officers, the nurses, Dr. Grant and myself all would see him on a gully, he would be seen multiple times in a day.  The problem was in talking to him you got no coherent response.").  Specifically, Dr. Berger noted that it was not that Defendant was slurring his words or couldn't speak properly, but that Defendant presented sentences in a disjointed, illogical manner so that it was impossible to understand him.  Id. 85:13-15.

Dr. Berger also testified as to the expected results once antipsychotics are administered to Defendant.  Dr. Berger testified that, both in his experience and as generally recognized in the medical profession, patients with a diagnosis of Schizophrenia have about a 70% probability of restoration to competency once antipsychotics are taken.  See id. 87:15-20 (noting that 10-15% of persons do not respond or partially respond to antipsychotics).  After administering the antipsychotics, Dr. Berger particularized "target symptoms" that he would be looking for to ensure the antipsychotics were having a positive effect.  Specifically, Dr. Berger stated that he would

look at whether Defendant's organization of thought, emotions, and affect were rational and make sense.  Dr. Berger stated that he would expect substantial improvement in Defendant's condition after several weeks of administration of the antipsychotics.  See id. 97:9-13 ("Often you see people much less agitated, much less agitated, much less anxious within a week or so, but you don't see the disorganization, the hallucinations leave for several weeks, four weeks typically.").

Further, Dr. Berger testified that Defendant would only be forcibly medicated to restore his competency to stand trial. The administration of medication would therefore not continue in futuro, but would cease once Defendant's criminal proceedings were concluded.  However, Dr. Berger stated that often when patients are administered antipsychotics "they realize what state they were in and actually convert over to voluntary treatment." See id. 99:9-12.  Thus, there is a likelihood that once restored, Defendant would voluntarily continue taking antipsychotics based on the relief provided by a clearer state of mind.

Dr. Berger discussed the procedure for forcible medication at length during the Sell hearing.  First, prior to drug administration, Dr. Berger would discuss the following with Defendant: his options, the purpose of the drugs, the side effects of the drugs, and the hoped-for relief the drugs would provide.  Defendant would have the option of taking the

medication and, if he still refused, Defendant would have the option to choose between an injectable or oral administration. See id. 99:24-25 ("I will want him to be aware that we do mouth checks . . . . If he is taking the injection, he would have to receive it on a therapeutic time interval, two to four weeks once it is stabilized."). If Defendant is physically aggressive in his refusing the antipsychotic medication, Defendant would be alerted that a team would be coming to administer the medication. Medical and correctional staff with proper precautionary gear would physically restrain Defendant until the medicine was administered or until Defendant ceased struggling. See id. 102:1-5 ("It [forcible administration of medication] is very distressing. It was actually designed to not have people hurt, either staff or the inmate and it seems to work fairly well that way. It is videotaped and I think each and every one is reviewed at our regional or central office.").

        In its consideration, the Court must also be wary of the side effects antipsychotic drugs will have on Defendant's appearance should he choose to proceed to trial and the prejudice that may result. In Sell, the Supreme Court focused its analysis on the defendant's ability to assist trial counsel once medicated and Justice Kennedy, in his concurring opinion, cautioned that prejudice may occur whereby Defendant's "(1) demeanor [is altered] in a manner that will prejudice his reactions and

-25-

presentation in the courtroom, and (2) render[ed] unable or unwilling to assist counsel . . . ." Moruzin, 583 F. Supp. 2d at 549 (citing Sell, 539 U.S. at 180 (J. Kennedy, concurring)).

Here, Dr. Berger noted three drugs likely to be amdinistered to Defendant: Haldol, Prolixin, Risperdal. See Berger Test. (noting the list provided was nonexclusive and nonexhaustive). Dr. Berger acknowledged that there is a likelihood that Defendant could experience some side effect symptoms. Side effect symptoms of first generation antipsychotics (such as Haldol and Prolixin) include extrapyramidal symptoms (neuromuscular effects that can flatten or blend a person's facial expression), tremors, blurred vision, Parkinson-like walking motions, and tarded dyskinesia (restlessness, movement disorder whereby persons smack, move or lick their lips). Side effects occur in up to thirty (30) percent of patients on antipsychotics. See id. 105:3-7, 106:2-5 (Dr. Berger noted that only 5% of patients on antipsychotics suffer from tarded dyskinesia and that it is only disfiguring in a fraction of that 5%). Dr. Berger also testified that second generation medicines, such as Respiridone, have a different side effect profile. Additionally, Dr. Berger stated that he would only use a sedative if the patient was highly agitated and only on an emergency basis. See id. 116:9-10.

However, Dr. Berger noted that side effect symptoms can

be managed, specifically for the purposes of trial, by "either initiat[ing] side effect medication specific to the symptom he's displaying [or] decreas[ing] the medication dosage." See id. 129: 11-16 (noting Dr. Berger "would look more at [Defendant's] ability to cognitively and rationally assist his attorney and understand what is going on, over displays of tarded dyskinesia" — disfiguring movements). The doctors would also be physically and metabolically monitoring Defendant's response to the antipsychotics. If the side effects could not be effectively managed, Dr. Berger testified that he would "discontinue the medication and try a different medication." See id. 126:19-23.

Before the Court, Doctor Grant and Doctor Berger also addressed Defendant's physical prognosis and likely physical reaction to the antipsychotics. Dr. Grant, in reading Dr. Nieberding's medical report, stated that Defendant's medical history included "[a] prior diagnosis of sickle cell anemia, hypertension and occasional reports of chest pain, but they did not require treatment over the past year that he knew about." Thus, where Dr. Nieberding's report was issued on October 15, 2008, Defendant had not experienced either hypertension or chest pain since 2007. Drs. Grant and Berger reported that since his arrival at FMC Butner in June 2009, Defendant did not report any physical discomforts. On redirect, Dr. Berger testified that he has personally medicated thousands of patients and has never had

a patient with fatal medication at all, or fatal medication of an antipsychotic.  See id. 126:13-24.  Specifically, in addressing the safety of the antipsychotics to be given to Defendant, Dr. Berger testified that he has been administering Prolixin for "over several decades" and Risperidone "over the last seven to ten years" and believed that there is a substantial probability that Defendant would respond positively to the antipsychotics administered.  See id. 131:19-22.

As such, the Court finds that the Government has established, by clear and convincing evidence, that the governmental interests will be significantly furthered by Defendant's forcible administration of medication.  Further, where Dr. Grant and Dr. Berger's testimony elucidated the process of forcible medication, types of drugs to be administered and potential side effects, the Court is satisfied that Defendant will not be prejudiced in his presentation at trial.

3.  Necessity

The Government argues that the necessity of involuntary medication is clear to further the governmental interests and that alternative, less intrusive treatments would not reach substantially similar results.  See Govt Sell Mem 13.  In opposition, defense counsel contends that forcible medication is not necessary "before other avenues of treatment [a]re exhausted."  See Def. Sell Mem. 13 (citing United States v.

McCray, 447 F. Supp. 2d 671, 682 (D.N.J. 2007) (holding that "the risks of serious side effects are balanced against the questions that exist affecting the potential effectiveness of drug treatment")).

The third Sell factor requires the Court to consider whether "any alternative, less intrusive treatments are unlikely to achieve substantially the same results [and that] [t]here is no evidence to suggest that any alternative less intrusive means exist to achieve substantially the same results." Sell, 539 U.S. at 181.

The record has made clear, and defense counsel does not dispute, that Defendant refuses to participate in any form of therapy (including psychotherapy, an alternative, less intrusive treatment). Therefore, not only will alternative treatments not suffice, but will clearly not produce "substantially the same results" as is likely with administration of antipsychotics.

Further, it is likely that though the first forcible administration of medication would be intrusive, many patients will voluntarily continue medication once their thought processes have been made clearer. See Berger Test., Hr'g Tr. 125: 10-16 ("Typically, people gain some relief from the medication, just in organization . . . . I have seen people two and even three times be totally uncooperative, but that's very, very rare."). Lastly, Dr. Berger explicitly stated that if there was an alternative,

less intrusive treatment, he would use it. But that none exists. Thus, the hoped-for result would be that if Defendant is receiving mental clarity from the antipsychotics, he would choose to continue treatment, both in the form of medication and through alternative, less intrusive treatments such as behavioral therapy and psychotherapy.

As such, the Court finds that the Government satisfied the third Sell factor, by clear and convincing evidence, by demonstrating that alternative, less intrusive treatments are not available options, as Defendant refuses to participate in any form of rehabilitation. Therefore, "any alternative, less intrusive treatments are unlikely to achieve substantially the same results" as forcible medication and no evidence was proffered to suggest alternative treatments would "achieve substantially the same results."

### 4. Medical Appropriateness

The Government contends that forcible administration of antipsychotic drugs is "medically appropriate" here. See Govt Sell Mem. 13. Defense counsel argues that the likelihood that Defendant would suffer serious side effects is "not insignificant" and the fact that Defendant's psychological history is unclear greatly decreases the likelihood of success. See Def. Sell Mem. 14.

The fourth Sell factor requires the Court to consider

-30-

whether forcible "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." United States v. Grape, 509 F. Supp. 2d 484, 500 (W.D. Pa. 2007) (citing Sell, 539 U.S. at 181).

Defendant has been diagnosed by multiple doctors at various institutions as suffering from a disorganized type of Schizophrenia. Defendant is unable to communicate rationally, has delusional thoughts, is hostile and aggressive, and is not competent to stand trial or assist his attorney in his defense. Though side effects may occur, the history of antipsychotics has been to provide patients who suffer from mental illness relief from their disordered thinking. Defendant's aggressive manner and history of instigating fights with other inmates renders him unable to be removed from a secure housing unit. Without forcible medication and potential relief, Defendant's condition may not ever improve.

As stated above, where Defendant either refuses to participate in any interviews or psychotherapy or cannot do so in a competent manner, alternative treatments are not viable options. Importantly, as to Defendant's physical condition, Dr. Berger, Defendant's current physician, testified that he "believe[d] we have adequate information to proceed in a safe and responsible manner."

As such, the Court finds that the Government has

satisfied the fourth <u>Sell</u> factor, by clear and convincing evidence, by demonstrating that the forcible administration of antipsychotic drugs is medically appropriate for the finite period of time it takes for Defendant to be restored to competency and trial concluded.

## IV.  CONCLUSION

Following a <u>Sell</u> evidentiary hearing with expert testimony, the Court finds that the Government has demonstrated, by clear and convincing evidence, that all four <u>Sell</u> factors have been met.  As such, the Court will **GRANT** the Government's motion for involuntary medication of Defendant and intensive in-patient mental health treatment solely to restore Defendant's competency to stand trial in the instant matter.

The Court further orders that the Government inform the Court of Defendant's prognosis and status four weeks after the antipsychotic medications are administered to determine whether Defendant's competency has been restored.